**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
1091 North Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYCE KELLY, Derivatively on Behalf of Nominal Defendant SABLE OFFSHORE CORP., | Case No. _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JAMES C. FLORES, GREGORY D. PATRINELY, CHRISTOPHER SAROFIM, MICHAEL DILLARD, GREGORY PIPKIN, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TD SECURITIES (USA) LLC, THE BENCHMARK COMPANY, LLC, JOHNSON RICE & COMPANY, L.L.C., PEP ADVISORY LLC, ROTH CAPITAL PARTNERS, LLC, and TUOHY BROTHERS INVESTMENT RESEARCH, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SABLE OFFSHORE CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Bryce Kelly ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Sable Offshore Corp. ("Sable" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Sable, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Johnson v. Sable Offshore Corp., et al.*, Case No. 2:25-cv-06869 (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of Sable against certain of its officers and current and former members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least May 19, 2025 and June 4, 2025, inclusive, and violations of federal securities laws, and against the Underwriter Defendants[2] for aiding and

---

[1] The Individual Defendants are James C. Flores ("Flores"), Gregory D. Patrinely ("Patrinely"), Christopher Sarofim ("Sarofim"), Michael Dillard ("Dillard"), and Gregory Pipkin ("Pipkin").

[2] "Underwriter Defendants" means J.P. Morgan Securities LLC ("J.P. Morgan"), Jeffries LLC ("Jeffries"), TD Securities (USA) LLC ("TD USA"), The Benchmark Company, LLC ("Benchmark"), Johnson Rice & Company, L.L.C. ("Johnson
(footnote continued)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

abetting and violations of federal securities laws, as set forth below.

2.      Sable is an independent oil and gas company purportedly focused on developing the Santa Ynez Unit in federal waters offshore California.

3.      On November 1, 2022, Legacy Sable[3] entered into a Purchase and Sale Agreement with Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC"), pursuant to which Legacy Sable agreed to acquire certain assets from Exxon and MPPC in the Santa Ynez field in Federal waters offshore California and associated onshore processing and pipeline assets (the "Sable-EM Purchase Agreement").

4.      On November 2, 2022, Legacy Sable entered into an Agreement and Plan of Merger (the "Merger Agreement") with Flame Acquisition Corp. ("Flame"), a blank check company incorporated for the purpose of effecting a merger, which was publicly traded on the New York Stock Exchange ("NYSE"), and Sable Offshore Holdings LLC ("Holdco").

5.      On February 14, 2024, the merger contemplated by the Merger Agreement were consummated (the "Merger"), and Flame was renamed "Sable Offshore Corp." Concurrently on February 14, 2024, the transactions contemplated by the Sable-EM Purchase Agreement were consummated.

6.      Thereafter, on February 15, 2024, Sable's common stock began trading on the NYSE under the symbol "SOC."

7.      On or about May 21, 2025, Defendants held a secondary public offering

---

Rice"), PEP Advisory LLC ("PEP"), Roth Capital Partners, LLC ("Roth Capital"), and Tuohy Brothers Investment Research, Inc. ("Tuohy"), collectively. "Defendants" means Sable, the Individual Defendants, and the Underwriter Defendants, collectively.

[3] Legacy Sable refers to the Company (Sable Offshore Corp.) before the Merger (defined herein).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

("SPO"), pursuant to which Sable issued 10,000,000 shares of common stock at $29.50 per share. The Company raised gross proceeds of $295 million.

8. Prior to conducting the SPO, on May 19, 2025, the Company announced that it was restarting oil production at the Santa Ynez Unit and touted the impact this would have on the Company. Then, capitalizing on the increase in its stock price as a result of this announcement, the Company commenced the SPO at an artificially inflated price.

9. However, in reality, and unbeknownst to investors, the Company had not restarted oil production at the Santa Ynez Unit and would be unable to do so due to the Company's failure to obtain the necessary permissions.

10. The truth began to emerge on May 28, 2025, when a letter from the Lieutenant Governor of California and the chair of the California State Lands Commission to Sable's Vice President of Environmental & Government Affairs, Steve Rusch ("Rusch"), dated May 23, 2025 (the "May 23 Letter"), was published to the public. The May 23 Letter revealed, among other things, that the Company had not restarted operations at the Santa Ynez Unit and that the Company had failed to follow the proper procedures for restarting operations.

11. Also on May 28, 2025, news outlets began reporting that a California state court judge issued a preliminary injunction against Sable preventing the Company from working on its Las Flores pipeline off the coast of California, which was one of the assets acquired as part of the Sable-EM Purchase Agreement (the "Preliminary Injunction").

12. On this news, the Company's stock price declined $5.04 per share, or approximately 15.3%, to close at $27.89 per share on May 28, 2025

13. Then, on June 4, 2025, the truth was fully revealed when the Company filed a Form 8-K with the SEC announcing the Preliminary Injunction to its shareholders for the first time.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.     On this news, the Company's stock price declined $0.94 per share, or approximately 3.9%, to close at $23.10 on June 4, 2025.

15.     As set forth herein, the Individual Defendants and the Underwriter Defendants breached their fiduciary duties and/or violated federal securities laws by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants and Underwriter Defendants failed to disclose to investors that: (i) the Company had not restarted oil production off the coast of California; and (ii) as a result, the Company's positive statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all times.

16.     As a result of the foregoing, the Securities Class Action was filed against the Company, Defendants Flores and Patrinely (collectively, the "Officer Defendant"), and the Underwriter Defendants in the United States District Court for the Central District of California.

17.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

18.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

23.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

25.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Securities Class Action is pending in this

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

District.

# PARTIES

***Plaintiff***

26.    Plaintiff is, and has been at all relevant times, a shareholder of Sable. Plaintiff is a citizen of Washington, DC.

***Nominal Defendant***

27.    Nominal Defendant Sable is incorporated under the laws of Delaware with its principal executive offices located at 845 Texas Avenue, Suite 2920, Houston, Texas 77002. Sable's common stock is traded on the NYSE under the ticker symbol "SOC."

28.    Nominal Defendant Sable owns a substantial amount of assets and conducts a significant amount of business in California. According to the Company's annual report for 2024 filed on a Form 10-K with the SEC on March 17, 2025, the Company owns three oil platforms located in the federal waters offshore California. The Company also owns an onshore processing facility in southern California and a number of oil pipelines in California, including a crude oil pipeline that extends from the Los Flores Station on the California Coast to the Gaviota Pump Station in Santa Barbara County, California.

***The Individual Defendants***

29.    Defendant Flores has served as Chief Executive Officer ("CEO") and Chairman of the Board of the Company since February 2024. Flores is also the co-founder of Flame and previously served as the CEO, President, and Chairman of the board of directors of Flame. Upon information and belief, Defendant Flores is a citizen of Texas.

30.    Defendant Patrinely has served as Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of the Company since February 2024. Patrinely previously served as CFO and EVP of Flame. Upon information and belief,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendant Patrinely is a citizen of Texas.

31.    Defendant Sarofim has served as a director of the Company since February 2024. Sarofim previously served as a director of Flame from March 2021 until February 2024. Defendant Sarofim also serves as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, Defendant Sarofim is a citizen of Texas.

32.    Defendant Dillard has served as a director of the Company since February 2024. Dillard previously served as a director of Flame from March 2021 until February 2024. Defendant Dillard also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee and Compensation Committee. Upon information and belief, Defendant Dillard is a citizen of Oklahoma.

33.    Defendant Pipkin has served as a director of the Company since February 2024. Pipkin previously served as a director of Flame from March 2021 until February 2024. Defendant Pipkin also serves as Chair of the Company's Compensation Committee and as a member of the Company's Audit Committee and Nominating and Corporate Governance Committee. Upon information and belief, Defendant Pipkin is a citizen of Texas.

***The Underwriter Defendants***

34.    Defendant J.P. Morgan is an investment banking firm. J.P. Morgan served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Defendant J.P. Morgan's address is 383 Madison Avenue, New York, New York 10179.

35.    Defendant Jeffries is an investment banking firm. Jeffries served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Jeffries' address is 520 Madison Avenue,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

New York, New York 10022.

36.     Defendant TD USA is an investment banking firm. TD USA served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, TD USA's address is One Vanderbilt Avenue, New York, New York 10017.

37.     Defendant Benchmark is an investment banking firm. Benchmark served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Benchmark's address is 150 East 58th Street, 17th Floor, New York, New York 10155.

38.     Defendant Johnson Rice is an investment banking firm. Johnson Rice served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Johnson Rice's address is 639 Loyola Avenue, Suite 2775, New Orleans, Louisiana 70113-7105.

39.     Defendant PEP is an investment banking firm. PEP served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, PEP's address is 100 Waugh Drive, Suite 600, Houston, Texas 77007.

40.     Defendant Roth Capital is an investment banking firm. Roth Capital served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Roth's address is 888 San Clemente, Suite 400, Newport Beach, California 92660.

41.     Defendant Tuohy is an investment banking firm. Tuohy served as an underwriter of the Company's SPO and helped to draft and disseminate the SPO Documents. Upon information and belief, Tuohy's address is 641 Lexington Avenue, 15th Floor, New York, New York 10022.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of Sable, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

because of their ability to control the business and corporate affairs of Sable, the Individual Defendants owed Sable and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sable in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sable and its shareholders so as to benefit all shareholders equally.

43.    Each director and officer of the Company owes to Sable and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

44.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sable, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.    To discharge their duties, the officers and directors of Sable were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Sable, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47.    As senior executive officers and directors of a publicly-traded company

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that Sable implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

48. To discharge their duties, the officers and directors of Sable were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sable were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, and all other states in which it operates, and the United States, and pursuant to Sable's own Code of Business Conduct and Ethics ("Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Sable conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Sable and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Sable's publicly disclosed financial information would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.    Each of the Individual Defendants further owed to Sable and its shareholders the duty of loyalty requiring that each favor Sable's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

50.    At all times relevant hereto, the Individual Defendants were the agents

of each other and of Sable and were at all times acting within the course and scope of such agency.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sable.

## SABLE'S CODE OF CONDUCT

52.    Sable's Code of Conduct applies to "[a]ll directors, officers and employees. . .of the Company and all of its subsidiaries and controlled affiliates."

53.    The Code of Conduct begins by stating that it is intended to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosures;

- Compliance with applicable laws and governmental rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

54.    With respect to "Conflicts of Interest," the Code of Conduct states, in relevant part:

> Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board and/or the Company's General Counsel.

This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

- Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.

- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

55. With respect to "Disclosures," the Code of Conduct provides that:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

56. With respect to "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

might make an investment decision based on this information is not only unethical but also illegal.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

## **SABLE'S AUDIT COMMITTEE CHARTER**

57.    Pursuant to Sable's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of:

(i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

58.    The Audit Committee Charter tasks Sable's Audit Committee with the following "Duties and Responsibilities," among others:

*Interaction with the Independent Auditor*

1.    *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules. . . .

*Annual Financial Statements and Annual Audit*

3.    *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.    *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Results of Operations."

5.      *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

## Quarterly Financial Statements

6.      *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## Other Duties and Responsibilities

7. *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. *Risk Assessment and Risk Management.* The Committee must discuss the Company's policies with respect to risk assessment and risk management.

# SUBSTANTIVE ALLEGATIONS

## Background of the Company

59.     Sable is an independent oil and gas company purportedly focused on developing the Santa Ynez Unit in federal waters offshore California.

60.     On November 1, 2022, Legacy Sable entered into the Sable-EM Purchase Agreement with Exxon and MPPC, pursuant to which Legacy Sable agreed to acquire certain assets constituting the Santa Ynez field in Federal waters offshore California and associated onshore processing and pipeline assets from Exxon and MPPC (the "SYU Assets").

61.     On November 2, 2022, Legacy Sable entered into the Merger Agreement with Flame and Holdco, pursuant to which Legacy Sable would become a publicly traded company.

62.     On February 14, 2024, the Merger was consummated, and Flame was renamed "Sable Offshore Corp." Concurrently on February 14, 2024, the transactions contemplated by the Sable-EM Purchase Agreement were

16

consummated (the "Business Combination").

63. On February 15, 2024, Sable's common stock began trading on the NYSE under the symbol "SOC."

64. According to the Company's public filings, the assets acquired by the Company as a result of the Business Combination "are comprised of three platforms located in federal waters offshore California and an onshore processing facility and pipeline assets," and certain pipelines, which are used to deliver oil to local refinery markets, including one that extends from Los Flores Station off the California coast to Gaviota Pump Station in Santa Barbara County, California. Specifically, the Company purports that:

> SYU Assets are comprised of three platforms located in federal waters offshore California and an onshore processing facility and pipeline assets.
>
> The offshore position is comprised of 16 federal leases across approximately 76,000 acres and includes 100% working interest with an average 83.6% net revenue interest. The Hondo platform and the Harmony platform develop the Hondo Field, and the Heritage platform develops the Pescado and Sacate Fields. The platforms are located 5 to 9 miles offshore of Santa Barbara County in shallow water depths of 900 to 1,200 feet and service 112 wells, comprised of 90 producers, 12 injectors and 10 idle with an additional 102 identified, undrilled opportunities. . . .
>
> Sable also acquired the Pipelines in the Business Combination, which were owned and operated by Plains and were acquired by EM on October 13, 2022. The Pipelines were used to deliver oil to local refinery markets. Following the crude oil release described further below, Plains indicated it shut down the pipeline, initiated its emergency response plan, and the Pipelines were subsequently emptied and placed in a safe state.
>
> Line 324 (formerly known as Line 901) is a 24-inch, approximately 10.8 mile long crude oil pipeline that extends from the Los Flores Station on the California Coast to the Gaviota Pump Station in Santa Barbara County, California. Line 325 (formerly known as Line 903) is a 30-inch, approximately 113 mile long crude oil pipeline that extends from the Gaviota Pump Station in Santa Barbara County, California to the 30-inch pig receiver located in Pentland Station in Kern County, California with an intermediate station at Sisquoc mile post 38.5 in San Louis Obispo, California.

***The SPO***

65.     In connection with the SPO, on April 22, 2025, the Company filed a Registration Statement on a Form S-3 with the SEC (the "Registration Statement"). The Registration Statement stated, in relevant part, that:

> We may offer and sell up to $1,500,000,000 in the aggregate of the securities *identified above from time to time in one or more offerings*. This prospectus provides you with a general description of the securities *Each time we offer and sell securities, we will provide a supplement to this prospectus that contains specific information about the offering and the amounts, prices and terms of the securities*. The supplement may also add, update or change information contained in this prospectus with respect to that offering. You should carefully read this prospectus and the applicable prospectus supplement before you invest in any of our securities.

(Emphasis added).

66.     On May 1, 2025, the SEC declared the Registration Statement effective.

67.     On May 21, 2025, the Company filed a Prospectus on a Form 424B5 with the SEC, which served as a supplement to the Registration Statement, and which announced that the Company was offering 8,695,654 shares of its common stock at $29.50 per share. On May 22, 2025, the Company filed a supplement to the prospectus on a Form 424B5, constituting the final supplement to the Registration Statement (the "SPO Prospectus").

68.     On May 23, 2025, the Company announced the closing of the SPO, stating that it sold 10,0000,000 shares of its common stock at $29.50 per share, constituting $295 million in gross proceeds.

***Materially False and Misleading Statements***

69.     On May 19, 2025, the Company issued a press release titled "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in June 2025" (the "May 19 Press Release"). The May 19 Press Release stated, in relevant part:

> ***Sable Offshore Corp. ("Sable," or the "Company")(NYSE: SOC) today announced that as of May 15, 2025, it has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production***

*to Las Flores Canyon ("LFC"). Additionally, with the completion of the Gaviota State Park anomaly repairs on the Las Flores Pipeline System (the "Onshore Pipeline") on May 18, 2025, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree, the governing document for the restart and operations of the Onshore Pipeline.*

Seven of the eight sections of the Onshore Pipeline have been successfully hydrotested. Sable will complete the final hydrotest in order to meet the final operational condition to restart the Onshore Pipeline as outlined in the Consent Decree. *Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025.*

**Production Restart**

- *On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the SYU to LFC at a rate of ~6,000 barrels of oil per day.*

- Sable has been testing wells on Platform Harmony throughout May 2025 and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015 when the SYU produced approximately 45,000 barrels of oil equivalent per day.

- Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025 with the remaining Platform Harmony wells projected to be tested over the course of the next several days.

- Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively.

(Emphasis added).

70.    Defendant Flores was quoted in the May 19 Press Release as stating, in relevant part:

*S[able] is proud to have safely and responsibly achieved first production at the Santa Ynez Unit*[.] The impressive well tests from Platform Harmony confirm the prolific nature of the Santa Ynez Unit reservoir after being dormant for ten years. *S[able] is excited about our development plan and prospects for the future.* This milestone achievement is a result of a tremendous amount of effort from all of Sable's employees, contractors, Board of Directors, stakeholders, and suppliers. *We are very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California.*

(Emphasis added).

71.     The May 19 Press Release also contained the following "Updated Guidance":

| | Prior Guidance (1) | | | Updated Guidance (2) | | |
|---|---|---|---|---|---|---|
| **2H25 Guidance** | | | | | | |
| **Production** | | | | | | |
| Net Average Daily Production (BOE/D) | 20,000 | — | 25,000 | 40,000 | — | 50,000 |
| Working Interest (%) | | 100.0% | | | 100.0% | |
| Average Net Revenue Interest (%) | | 83.6% | | | 83.6% | |
| **Cash Costs ($ / BOE)** | | | | | | |
| Lease Operating Expense | $ 17.00 | — | $ 19.00 | $ 11.00 | — | $ 13.50 |
| *% Fixed LOE* | | | | 75% | — | 85% |
| Gathering, Processing & Transportation | $ 2.50 | — | $ 3.50 | $ 2.50 | — | $ 3.50 |
| Cash General & Administrative | $ 4.50 | — | $ 5.50 | $ 2.50 | — | $ 3.50 |
| Severance & Ad Valorem Taxes (% of Revenue) | | 0.5% | — | 1.0% | 0.5% | — | 1.0% |
| **Operational Capex** | | | | | | |
| Facilities Capex ($MM) | $ 50 | — | $ 60 | $ 50 | — | $ 60 |
| Workover Capex ($MM) | 20 | — | 30 | 20 | — | 30 |
| Total Capex ($MM) | $ 70 | — | $ 90 | $ 70 | — | $ 90 |

72.     Following the news of the restarting of oil production at the Santa Ynez Unit, the Company's stock price shot up—going from a closing price of $28.86 per share on May 16, 2025, to a closing price of $33.02 per share on May 19, 2025, an increase of approximately 14.4%.

73.     However, the statements contained in the May 19 Press Release were materially false and misleading because, despite the Company's representations, Sable had not resumed commercial production off the coast of California.

74.     Despite this, the Company capitalized on its increased stock price and commenced its SPO, filing SPO Prospectus in connection therewith.

75.     The SPO Prospectus contained similarly materially false and misleading statements regarding the Company's production off the coast of California. Specifically, the SPO Prospectus stated, in relevant part:

**Recent Events**

***Restart of Production and Restarting Lines 324 and 325***

***On May 15, 2025, Sable initiated oil production from six wells on Platform Harmony at SYU and began flowing oil production to Las***

*Flores Canyon ("LFC") at an initial rate of approximately 6,000 barrels of oil per day*. Sable has tested approximately 30% of the 32 producing wells on Platform Harmony with the remaining Harmony Platform wells to be tested over the course of the next several days. *Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively. The initial production rates as our wells are brought back into production have been higher than the rate of sustained production at such wells, but are expected to decline from initial highs, as production rates from wells typically decline over time*. See "Risk Factors—Risks Associated with our Operations."

On May 18, 2025, Sable completed anomaly repairs on Line 324 (formerly known as Line 901), which extends from the Las Flores Station on the California coast to the Gaviota Pump Station in Santa Barbara County, California, and Line 325 (formerly known as Line 903), which extends from the Gaviota Pump Station to Pentland Station in Kern County, California, the point of sale. With the completion of such repairs, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by a Consent Decree that Plains entered into with various governmental agencies in 2020 (the "*Consent Decree*"), the governing document for the restart of the Onshore Pipeline.

(Emphasis added).

76.     These statements, in part, caused investors to purchase shares of Sable during the SPO.

77.     The above statements contained in the May 19 Press Release and the SPO Prospectus were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants and the Underwriter Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had not restarted oil production off the coast of California; and (ii) as a result, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

78.     The truth began to emerge on May 28, 2025, when the May 23 Letter from the Lieutenant Governor of California and the chair of the California State Lands Commission to Sable's Vice President of Environmental & Government

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Affairs, Rusch, was published to the public. The May 23 Letter revealed, among other things, that the Company had not restarted operations at the Santa Ynez Unit and that the Company had failed to follow the proper procedures for restarting operations.

79.     Specifically, the May 23 Letter explained that the Company had only begun limited volume oil flows as a part of a testing procedure at the Santa Ynez Unit, and that the statements that production had resumed were misleading to the public, stating, in relevant part:

> I am writing to express my serious concerns regarding Sable Offshore Corp.'s press release dated May 19, 2025, entitled, "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025," which you sent to Commission staff on the same day. *The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions*.

> Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart. *These activities do not constitute a resumption of commercial production or a full restart of the SYU. Characterizing testing activities as a restart of operations is not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU*.

80.     The May 23 Letter further revealed that the Company failed to properly notify the California State Lands Commission of its activities and outlined the repercussions of these actions to Sable, stating, in relevant part:

> I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity. Sable's failure to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities, and raises serious questions about Sable's willingness to be a transparent operator.

> Commission staff's letter dated May 9, 2025, made clear that failure to comply with applicable regulatory requirements or to resolve any

outstanding regulatory issues could constitute a breach of the Commission's leases. Any attempt to restart commercial operations at the SYU without final regulatory approvals may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease.

81.     Also on May 28, 2025, news outlets began reporting that a California state court judge issued the Preliminary Injunction against Sable preventing the Company from working on its Las Flores pipeline. For instance, one article revealed that:

> Sable Offshore announced that it has completed all required hydrotesting of onshore pipelines necessary to transport oil across Santa Barbara County, but the Houston-based company suffered a setback regarding repair work on along the coast in court Wednesday.

> The announcement of pipeline work comes as representatives of Sable Offshore and the California Coastal Commission met Wednesday about the pending litigation between the two entities.

> In late March, the state regulatory body levied millions of dollars in fines regarding the pipeline work that the agency says is not permitted.

> **Wednesday morning, Santa Barbara County Judge Thomas Anderle granted a preliminary injunction requested by the California Coastal Commission against Sable Offshore for alleged violations of The California Coastal Act.**

> **The injunction could impact Sable's ability to do future repairs or maintenance until its legal battle with the state regulator is settled.**

> Linda Krop with the Environmental Defense Center questioned Sable's assertions that it has completed all necessary repairs in an interview Wednesday with Your News Channel.

> She shared that this is the first time a judge has ruled that Sable Offshore is violating the law instead of state regulators and environmental groups.

> Krop, whose organization opposes restarting oil production and has been involved in multiple lawsuits related to the project, says Sable's attorney told the judge that granting the injunction would harm the company.

> "If Sable really has completed all the repairs, they would be fine with this injunction," argued Krop. "The injunction only applies to repairs on the pipeline. So why does Sable care about this injunction if it's really completed the repairs?"

> On Tuesday, May 27, Sable Offshore confirmed to investors in an 8K

23

filing with the U.S. Securities and Exchange Commission that the last outstanding hydrotest was performed on the final segment of Line 325.

All hydrotesting for both Lines 324 and 325 have been completed which was the final operational condition to restart their use and no more repairs are still required stated Sable Offshore. . . .

*A California Coastal Commission spokesperson sent a statement in response to Your News Channel's inquiries stating, "Sable has consistently ignored California law, as confirmed by the court's decision today [Wednesday] to halt work on this aging oil pipeline in Santa Barbara. This fly-by-night oil company has repeatedly abused the public's trust, racking up millions of dollars in fines and causing environmental damage along the treasured Gaviota Coast."*

(Emphasis added).[4]

82.    On this news, the Company's stock price fell $5.04 per share, or approximately 15.3%, to close at $27.89 per share on May 28, 2025

83.    Then, on June 4, 2025, the truth was fully revealed when the Company filed a Form 8-K with the SEC announcing the Preliminary Injunction to its shareholders for the first time. The Form 8-K stated:

***Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al. Matter***

On June 3, 2025, a Santa Barbara County Superior Court Judge granted *ex parte* requests from plaintiffs in *Center for Biological Diversity, et al. v. California* Department of Forestry and Fire Protection, et al. (25CV02244) and Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al. (25CV02247) for temporary restraining orders prohibiting Sable Offshore Corp. ("Sable") from restarting transportation of oil through the Las Flores Pipeline System pending the hearing on an order to show cause regarding a preliminary injunction scheduled for July 18, 2025. Sable is exploring all possible avenues available to address these preliminary rulings. Sable is now targeting August 1, 2025 for first sales due to this

---

[4] Andrew Gillies & Mina Wahab, *Santa Barbara County Judge Issues Preliminary Injunction Against Sable Offshore as the Company Announces Completion of Pipeline Tests*, News Channel 3-12 (May 28, 2025), https://keyt.com/news/santa-barbara-s-county/2025/05/28/sable-offshore-has-completed-all-outstanding-pipeline-repair-work-necessary-to-restart-transporting-oil-across-santa-barbara-county/.

delay.

84.    On this news, the Company's stock price declined $0.94 per share, or approximately 3.9%, to close at $23.10 on June 4, 2025.

***Post-Relevant Period Events***

85.    On July 11, 2025, the Company filed a Form 8-K with the SEC revealing that the California court denied Sable's request to stay a cease and desist order regarding its maintenance and repair work in the California coastal zone. The Form 8-K stated:

> ***California Coastal Commission Matter***
>
> On July 9, 2025, in the matter of *Sable Offshore Corp., et al. v. California Coastal Commission, et al.* (25CV00974), the Santa Barbara County Superior Court (the "**Superior Court**") denied a motion to stay the California Coastal Commission's April 10, 2025 Cease and Desist Order regarding Sable Offshore Corp.'s ("**Sable**") maintenance and repair work in the coastal zone.
>
> Also on July 9, 2025, Sable filed a Notice of Appeal of the Superior Court's May 28, 2025 Order Granting Application for Preliminary Injunction (the "**Order**"). Sable intends to prosecute this appeal in the California Court of Appeal in an effort to lift the Order.
>
> Sable continues to produce from the Santa Ynez Unit and flow to the crude oil storage tanks at Las Flores Canyon in anticipation of receiving approval to restart the Las Flores Pipeline System, with first oil sales expected August 1, 2025.

## DAMAGE TO THE COMPANY

86.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

87.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls and compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Sable.

88.     Furthermore, as a direct and proximate result of the misconduct detailed herein, Sable has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

90.     Sable is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91.     Plaintiff is a current shareholder of Sable and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

92.     A pre-suit demand on the Board of Sable is futile and, therefore, excused. At the time this action was commenced, the four-member Board was comprised of Defendants Flores, Sarofim, Dillard, and Pipkin (the "Director Defendants"). Accordingly, Plaintiff is only required to show that two Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    futile act.

2        93.    The Director Defendants either knew or should have known of the false

3    and misleading statements that were issued on the Company's behalf and took no

4    steps in a good faith effort to prevent or remedy that situation.

5        94.    Each of the Director Defendants approved and/or permitted the wrongs

6    alleged herein to have occurred and participated in efforts to conceal or disguise

7    those wrongs from the Company's stockholders or recklessly and/or with gross

8    negligence disregarded the wrongs complained of herein and are therefore not

9    disinterested parties.

10       95.    Defendant Flores is not disinterested or independent and is therefore

11   incapable of considering a demand. Defendant Flores has served as the Company's

12   CEO and as Chairman of the Board since 2024. Thus, the Company admits that

13   Defendant Flores is a non-independent director. Moreover, Defendant Flores is

14   named as a defendant, and faces significant personal liability, in the Securities Class

15   Action based on substantially the same wrongdoing as alleged herein, specifically

16   issuing materially false and misleading statements discussed herein.

17       96.    Moreover, the Director Defendants willfully ignored, or recklessly

18   failed to inform themselves of, the obvious problems with the Company's internal

19   controls, practices, and procedures and failed to make a good faith effort to correct

20   the problems or prevent their recurrence.

21       97.    The Director Defendants took no action to redress the harm suffered by

22   the Company resulting from the misconduct alleged herein.

23       98.    The Director Defendants failed to take any action to sue the

24   Underwriter Defendants for their wrongdoing detailed herein. Accordingly, by

25   failing to take action against the Underwriter Defendants, the Director Defendants

26   breached their fiduciary duties, are not disinterested, and demand upon them is futile,

27   and thus excused.

28

99.    Additionally, the Director Defendants are not independent or disinterested in light of their longstanding business and personal relationships with each other and the Company. For instance, Director Defendants Dillard, Sarofin, and Pipkin all served on the board of directors of Flame, of which Defendant Flores is the co-founder and served as the CEO, President, and Chairman of the board of directors.

100.    Defendants Dillard, Pipkin, and Sarofim served on the Company's Audit Committee at relevant times (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

101.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of

liability for breaching their fiduciary duties, and therefore demand upon them is futile.

102.   All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

103.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

104.   The acts complained of herein constitute violations of fiduciary duties owed by Sable's officers and directors, and these acts are incapable of ratification.

105.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Sable. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Sable,

there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

106. If there is no directors' and officers' liability insurance, then the directors will not cause Sable to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

107. Thus, for all of the reasons set forth above, all of Sable's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**COUNT I**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

108. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

110. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

111. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of

materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company had not restarted oil production off the coast of California; and (ii) as a result, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

113.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

114.  In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein

115.  As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

116.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual

Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

117.    Plaintiff, on behalf of Sable, has no adequate remedy at law.

## COUNT II
### Against the Underwriter Defendants for Aiding and Abetting Breach of Fiduciary Duty

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    Each of the Individual Defendants had fiduciary relationship with Sable and owed Sable fiduciary duties. As set forth above, the Individual Defendants breached its fiduciary duties to Sable.

120.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Underwriter Defendants have each encouraged, facilitated, and advanced the Individual Defendants breaches of their fiduciary duties.

121.    Specifically, the Underwriter Defendants knowingly participated in the Individual Defendants breach of fiduciary duties by permitting and/or causing the Individual Defendants to issue the materially false and misleading statements to the public set forth above, including in the SPO Prospectus filed by the Company with the SEC.

122.    As a result, the Underwriter Defendants have each aided and abetted, conspired, and schemed with the Individual Defendants to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and

illegal conduct complained of herein.

123.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants
### For Unjust Enrichment

124.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sable.

126.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sable that were tied to the performance or artificially inflated valuation of Sable, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127.   Plaintiff, as a shareholder and a representative of Sable, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

128.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Waste of Corporate Assets

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.   The wrongful conduct alleged regarding the issuance of false and

misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

131. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

132. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133. Plaintiff, on behalf Sable, has no adequate remedy at law.

## COUNT V
**Against Defendants Flores and Patrinely for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135. As a result of the misconduct alleged above, Sable and Defendants Flores and Patrinely (collectively, the "Officer Defendants"), among others, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder by the SEC.

136. The Securities Class Action alleges that the Company issued numerous untrue statements of material facts and/or omitted to state material facts in its public filings, including in the SPO Prospectus.

137. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to the Officer Defendants' willful and/or reckless violations

of their obligations as officers and/or directors of Sable.

138.   The Officer Defendants, because of their positions of control and authority as officers and directors of Sable, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sable, including the wrongful acts complained of herein and in the Securities Class Action.

139.   Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

140.   As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

141.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## COUNT VI
**Against the Officer Defendants and the Underwriter Defendants for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act**

142.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.   As a result of the misconduct alleged above, Sable, along with the Officer Defendants and Underwriter Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of 11, 12(a)(2), and 15 of the Securities Act

144.   Federal law provides Sable with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

145.   The plaintiff in the Securities Class Action allege that the SPO Prospectus, filed with the SEC in connection with its SPO, contained untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

146.    The Company was the registrant for the SPO, and the Individual Defendants and/or Underwriter Defendants named herein were responsible for the contents and dissemination of the SPO Prospectus.

147.    As the issuer of the shares in the SPO, Sable is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged therein.

148.    The plaintiff in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Prospectus were true and not misleading.

149.    The Officer Defendants, because of their positions of control and authority as officers and directors of Sable, and the Underwriter Defendants, because of their positions of control and authority as underwriters of Sable's SPO, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sable, including the wrongful acts complained of herein and in the Securities Class Action.

150.    Accordingly, the Individual Defendants and the Underwriter Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

151.    As such, Sable is entitled to receive all appropriate contribution or indemnification from the Officer Defendants and the Underwriter Defendants.

152.    Plaintiff, on behalf of Sable, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly

and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Sable to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sable and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions.

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: August 21, 2025

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

**RIGRODSKY LAW, P.A.**

By:  */s/ Gina M. Serra*
Gina M. Serra (#361172)
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT